UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
—————————————————————————X


ITALVERDE TRADING, INC. and
DELVERDE, SpA,

                Plaintiffs,

     -against-                            <u>MEMORANDUM & ORDER</u>
                                           04-CV-2793 (NGG) (VVP)

FOUR BILLS OF LADING Numbered
LRNNN 120950, LRNNN 122950,
LRNN 123580, and MSLNV 254064
and SAVINO DEL BENE USA, INC.,

                Defendants.

—————————————————————————X

GARAUFIS, United States District Judge:

     This civil action involves a dispute between Plaintiff Delverde, SpA ("Delverde"), a

pasta manufacturer, Plaintiff Italverde Trading, Inc. ("Italverde"), Delverde's subsidiary and

exclusive United States distributor, and Defendant Savino del Bene USA, Inc. ("Defendant" or

"Savino"), Delverde's freight forwarder and customs broker.  The instant dispute arose when

Savino seized Delverde pasta and sold it in the United States, ostensibly for the purpose of

recovering a debt Delverde owed to Savino's subsidiary.  Delverde and Italverde allege that

Savino's seizure and sale of the pasta was tortious.  At this time, Delverde and Italverde move

for summary judgment on the first, third, fifth, and sixth claims in the Complaint and Savino

moves for summary judgment on the first, third, fourth, and sixth claims in the Complaint.  For

the reasons described below, Plaintiffs' and Savino's motions are denied.

## I.     Factual Background

Before setting forth the relevant facts, I note that when deciding a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party and must draw all permissible inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Vann v. City of New York</u>, 72 F.3d 1040, 1048-49 (2d Cir. 1995).  Even in a fact-intensive case, however, the court will not accept as fact mere allegations lacking evidentiary support.  <u>Abdu-Brisson v. Delta Air Lines</u>, 239 F.3d 456, 466 (2d Cir. 2001).

## <u>The Parties</u>

Plaintiff Delverde is an Italian corporation located in Cheiti Province, Italy that manufactures pasta and, often through subsidiaries, sells pasta in a number of countries, including the United States.  (Plaintiff[s'] Statement of Material Facts as to Which No Genuine Issue Exists ("Pl. 56.1") ¶ 1; Defendant's Rule 56.1 Statement ("Def. 56.1") ¶¶ 1, 2.)  Delverde owns the Delverde brand trademark.  (Pl. 56.1 ¶ 1.)  Italverde is a United States corporation located in Rutherford, New Jersey that is a wholly owned subsidiary of Delverde.  (<u>Id.</u> ¶ 2.)  Italverde is the exclusive distributor of Delverde brand pasta in the United States and the U.S. licensee of the Delverde brand trademark.  (<u>Id.</u> ¶ 2.)

Savino del Bene USA, Inc. ("Savino") is a New York corporation with its principal place of business in Jamaica, New York.  (Def. 56.1 ¶ 3.)  Savino del Bene SpA ("Savino Italy") is an Italian-based company that is a subsidiary of Savino.  (<u>Id.</u> ¶¶ 4-5.)  Both Savino and Savino Italy provide freight-forwarding services and Savino is a licensed United States customs broker.  (<u>Id.</u> ¶¶ 6-7.)  In or around April, 2001, Delverde retained Savino Italy to forward shipments of Delverde pasta to Italverde and retained Savino as its customs broker.  (<u>Id.</u> ¶ 8.)

**Relationship Between Delverde/Italverde**

Delverde and Italverde entered into a written agreement titled Agreement Regarding Purchase of Products and Related Matters dated December 12, 2002 ("Purchase Agreement"). Paragraph 5 of the Agreement states:

> The Seller and Italverde hereby agree that title to, and the risk of loss of theft, damage or destruction to the Products shall remain with the Seller until due delivery and tender by the Seller of conforming Products to Italverde in the Territory, at the location designated by Italverde.

(April 28, 2006 Affidavit of Matthew C. Mason ("Mason Aff.") Ex. F ¶ 5(g); Def. 56.1 ¶ 20; Plaintiffs' Response to Defendant's Rule 56.1 Statement ("Pl. 56.1 Resp.") ¶ 20.) The Agreement defines the term "Territory" as the Untied States, the Republic of Mexico, and "all of the countries of Central America and South America." (Mason Aff. Ex. F ¶ 5(e).)

The agreement also provides that the "parties may amend, modify and supplement this Agreement only by a written instrument executed by all of the parties hereto with the same formality as this Agreement." (Mason Aff. Ex. F ¶ 8(c).)

**The Italian Litigation**

On March 10, 2004, the Civil Court of Florence, Italy issued an *ex parte* Order directing Delverde to pay Savino Italy 604,818.06 euros plus costs and interest. (Pl. 56.1 ¶ 4; Def. 56.1 ¶ 9.) The Florence Court's Order provided "that within 40 (forty) days of the date of service of this official document a challenge may be filed in the form required by law and, if no challenge is filed, the Court will proceed with the enforcement." (Pl. 56.1 Ex. A.) Savino Italy did not serve the Order until April 9, 2004, approximately 30 days after the order was issued. (Pl. 56.1 ¶ 4; Defendant Savino Del Bene USA, Inc.'s Response to Plaintiffs' Statement of Material Facts as to which No Genuine Issue Exists ("Def. 56.1 Resp.") ¶ 4.) On May 13, 2004, Savino Italy

requested and obtained an Order from the Florence Civil Court authorizing a Judicial Officer to seize assets of Delverde which were in the possession of Savino Italy. (Pl. 56.1 ¶ 5; Def. 56.1 Resp. ¶ 5.)

On May 21, 2004, Delverde filed an *ex parte* motion in the Civil and Criminal Court of Cheiti, Italy, requesting the Court to enjoin any effort to enforce the March 10 Florence Court Order. (Pl. 56.1 ¶ 6; Def. 56.1 Resp. ¶ 6.) The Cheiti Court issued an order prohibiting Savino Italy "from [engaging in] any and all enforcement activities" relating to the March 10 Florence Court Order. (Pl. 56.1 ¶ 6, Ex. C; Def. Resp. ¶ 6.) The parties dispute whether the Cheiti Court Order is valid. Savino asserts that the Cheiti Court Order is the product of Delverde's forum shopping and that, because Delverde failed to obtain the Order from the Florence Civil Court, it is invalid. (Def. 56.1 Resp. ¶ 6.)

On June 3, 2004, a Judicial Officer of the Florence Court of Appeals performed an official seizure of specific goods and "enjoin[ed] the debtor [Delverde] from any action aimed at removing. . . . the [specific] movable goods from the creditor [Savino Italy]." (Pl. 56.1 ¶ 7, Ex. D; Def. 56.1 Resp. ¶ 7.)

On June 30, 2004, the Cheiti Court confirmed its May 28 Order and enjoined any and all enforcement of the Florence Court's March 10 Order. (Pl. 56.1 ¶ 8, Ex. E; Def. 56.1 Resp. ¶ 8.) Although the June 30 Order is not entirely clear, it appears to find that the Florence Civil Court lacked the jurisdiction or authority to have issued the March 10 Order. (Pl. 56.1 ¶ 8, Ex. E.) Savino disputes the validity of the Cheiti Court's June 30 order. (Def. 56.1 Resp. ¶ 8.) On July 8, 2004, Savino Italy withdrew the June 3 enforcement action filed in the Florence Civil Court. (Pl. 56.1 ¶ 9; Def. 56.1 Resp. ¶ 9.) Savino denies that the withdrawal implies that the Florence Court proceeding or related orders were invalid. (Def. 56.1 Resp. ¶ 9.)

After the Florence Civil Court issued the March 10 Order, Savino Italy assigned to Savino its interest in the debt that was the subject of the March 10 Order. (Pl. 56.1 ¶ 10; Def. 56.1 Resp. ¶ 10.) At no time did Savino seek to have the Florence Court Order recognized by a court in the United States. (Pl. 56.1 ¶¶ 19, 21; Def. 56.1 Resp. ¶¶ 19, 21.)

**Savino Seizes and Sells the Pasta**

At the time of the Italian litigation, Savino had physical possession of various shipments of Delverde-brand pasta. (Pl. 56.1 ¶ 10; Def. 56.1 Resp. ¶ 10.) Although the parties agree that Savino was holding the pasta in its capacity as customs broker for at least some portion of this time, it is not clear whether either Savino or Savino Italy (or both) were serving as Plaintiffs' freight forwarder. (See June 15, 2006 Affidavit of Matthew C. Mason In Opposition To Plaintiffs' Motion for Summary Judgment ("Mason Opp. Aff.") Ex. B (document that appears to be freight forwarding contract).)

Between May and June 2004, Savino Import Manager Marco Sigrist informed Italverde that Savino would not release certain containers of pasta in its possession. (Pl. 56.1 ¶ 11; Def. 56.1 Resp. ¶ 11.) Savino asserts that it then offered to sell the pasta in its possession to Italverde upon full payment of the full commercial invoice amount or posting a letter of credit. (See Def. 56.1 ¶ 12.) However, Plaintiffs have not admitted this allegation. (See Pl. 56.1 Resp. ¶ 12.)

On June 15, 2004, Delverde revoked Savino's Power of Attorney over the pasta containers in Savino's possession. (Pl. 56.1 ¶ 15; Def. 56.1 Resp. ¶ 16.) This Power of Attorney authorized Savino to serve as the customs broker for the pasta. (Mason Opp. Aff. ¶ 6, Ex. D.) After this revocation, Savino substituted itself as importer of record on official government documents for at least some of the pasta shipments in its possession. (Pl. 56.1 ¶ 15; Def. 56.1 Resp. ¶ 15.)

5

At some point, Sigrist began contacting the persons who had ordered the pasta and who were identified on the commercial invoices as the purchasers of the pasta in Savino's possession. (Pl. 56.1 ¶ 12; Def. 56.1 Resp. ¶ 12; Def. 56.1 ¶ 13; Pl. 56.1 Ex. N ("Sigrist Dep.") at 25-28.) Plaintiffs assert that this occurred on or about June 9, 2004 and Savino states that this occurred some time after Savino Italy assigned whatever rights it had in the pasta to Savino.[1] (Pl. 56.1 ¶ 12; Def. 56.1 Resp. ¶ 12; Def. 56.1 ¶ 13.) Sigrist provided customers copies of the Florence Court's March 10 Order and described the Order to one or more customers as the "sentence" of the Italian court. (Pl. 56.1 ¶ 13; Def. 56.1 Resp. ¶ 13.) In a telephone conversation with Columbus Foods, without Columbus Foods having raised the issue of future pasta shipments, Sigrist went out of his way to state that "I was not in any way interested in doing any function in terms of providing additional pasta." (Sigrist Dep. at 28.)

Italverde also asserts that, when Savino would contact its customers, it would "threaten[] to dump the product on the market and ruin [the customers]." (Pl. 56.1 Ex. T ("Schettini Dep.") at 84-85.) Italverde President Francesco Schettini described Savino's approach to negotiating sales of the pasta: "If he doesn't buy it, Marco [Sigrist] said, I have to sell this product. If you don't buy it, I am going to dump the product on the market and your market is going to be ruined. Dump meaning underprice, undercost." (Id. at 85.) In fact, at least one of Italverde's customers, Musco, purchased pasta from Savino that it did not even need and then re-sold it to Italverde. (Id. at 90-91.) This purchase and re-sale may have been for the purpose of preventing

---

[1] Plaintiffs also state that Savino instructed Sigrist to seize and sell the pasta in "early May" 2004. (Sigrist Dep. at 21-26.)

Savino from selling the pasta for less than the fair market value.[2]

Between May and August 2004, Savino sold some of the containers of pasta that were in its possession. (Pl. 56.1 ¶ 16; Def. 56.1 ¶ 16.) Seven of the pasta containers were sold by Savino directly to Italverde and eight containers were sold to customers of Delverde/Italverde. (Def. 56.1 ¶ 18; Pl. 56.1 ¶ 18.) Italverde President Francesco Schettini confirmed to Delverde/Italverde customers that Savino was in possession of actual Delverde-brand pasta and advised at least some customers to purchase the pasta from Savino. (Def. 56.1 ¶ 17; Pl. 56.1 Resp. ¶ 17.)

Plaintiffs allege that Savino continued to contact at least one of its customers—Columbus Foods—on July 29, after Savino had already sold all of the Delverde pasta it had seized to Plaintiffs' customers and Italverde. (See Pl. 56.1 ¶ 18, Ex. P; Def. 56.1 ¶ 18.) Specifically, Plaintiffs assert that Savino directed Savino employee Marco Sigrist "to sell the pasta to any supermarket at any price." (Id.)

Plaintiffs assert that Savino's conduct caused them to suffer damages. Plaintiffs claim that Savino sold the pasta to Plaintiffs' customers at a price that was lower than the price at which the customers had agreed to purchase the pasta. (June 15, 2006 Affidavit of Joseph Sellitto ("Sellitto Aff.") at pages 3-4.[3]) By doing so, Savino effectively deprived Italverde of the mark-up that it was charging its customers. Further, in effecting the sales, Savino allegedly

---

[2] Although the deposition transcript is not entirely clear, it appears that much of Schettini's testimony concerning what Savino employees said to Italverde customers is inadmissible hearsay. However, the fact that Musco purchased Delverde pasta from Savino and quickly sold it to Italverde is admissible.

[3] There appears to have been a typographical error in the numbering of the paragraphs in the Sellitto Affidavit. As a result, citations to the Sellitto Affidavit are made with reference to page numbers.

disclosed to Plaintiffs' customers the price at which Italverde was purchasing the pasta from Delverde, which was lower than the price Plaintiffs had been quoting to their customers. (Id.)

Plaintiffs also allege that Savino's seizure of the pasta caused delays in the delivery of the pasta to Plaintiffs' customers. As a result of these delays, Plaintiffs assert that they lost customers. (Sellitto Aff. at pages 3-4.)

## II.    Legal Analysis

### A.    Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "A fact is 'material' for these purposes if it might affect the outcome of the suit under the governing law. An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz, 258 F.3d at 69 (citations and quotation marks omitted).

The moving party bears the burden of establishing the absence of a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). If the moving party has met this burden, then the non-moving party has the burden of "set[ting] forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The nonmovant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal quotations and citations omitted); see also Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the nonmovant

can create a genuine issue of material fact only by citing competent, admissible evidence.

Glasso v. Eisman, Zucker, Klein & Ruttenberg, 310 F. Supp. 2d 569, 574 (S.D.N.Y. 2004)

(citing Sarno v. Douglas Elliman-Gibbons & Ives, 183 F.3d 155, 160 (2d Cir. 1999)).

### B.     Choice of Law

The parties have not briefed the choice of law issue.  This court possesses pendent

jurisdiction and diversity jurisdiction over the first, third, fourth, and fifth claims in the

Complaint and, as a result, applies the choice of law doctrine of the forum state, New York.  See

Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997) ("In a diversity case,

we apply the choice of law rules of the forum state—in this case New York—to determine what

law governs" the issues arising under state law); Rogers v. Grimaldi, 875 F.2d 994, 1002 (2d Cir.

1989) ("A federal court sitting in diversity or adjudicating state law claims that are pendent to a

federal claim must apply the choice of law rules of the forum state.").  Accord Access 4 All, Inc.

v. Trump Int'l Hotel and Tower Condominium, No. 04-CV-9497, 2007 WL 633951, at *3

(S.D.N.Y. Feb. 26, 2007).

With respect to all but one of the legal issues presented by the first, third, fourth, and fifth

claims, the parties agree that New York law applies.  The parties' consent to the application of

New York law disposes of the choice of law question.  British Int'l Ins. Co. v. Seguros La

Republica, S.A., 342 F.3d 78, 81 (2d Cir. 2003) ("the parties agree that New York law governs

this case; their consent concludes the choice of law inquiry") (internal quotation omitted).

The parties do not consent to the application of New York law to the construction of the

Purchase Agreement between Delverde and Italverde.  As discussed below, New Jersey law

governs the construction of the Purchase Agreement.  With respect to all other legal issues

presented by the first, third, fourth, and fifth claims, upon the consent of the parties, the court will apply New York law.

The sixth claim arises under federal law and, as a result, federal law applies.

## C.    Conversion

Italverde and Savino each asserts that it is entitled to summary judgment on the first claim for conversion.  For the reasons described below, both motions are denied.

In order to prevail on a claim for conversion, a plaintiff "must show that (1) plaintiff had a legal ownership interest in the property, and (2) defendant exercised unauthorized interference with the plaintiff's ownership or possession of that property."  Reznor v. J. Artist Mgmt., Inc., 365 F. Supp. 2d 565, 579-80 (S.D.N.Y. 2005) (internal quotations omitted).  See also Manliguez v. Joseph, 226 F. Supp. 2d 377, 387 (E.D.N.Y. 2002) (Garaufis, *J.*) ("conversion is defined as any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property") (internal quotations omitted); Feld v. Feld, 279 A.D.2d 393, 394-95 (1st Dep't 2001) ("A cause of action for replevin or conversion requires a demand for the property and refusal" and the demand must "clearly convey[] the exclusive claim of ownership").

Savino asserts that it is entitled to summary judgment because (1) only Italverde brings a claim for conversion and (2) Delverde—as opposed to Italverde—held title in the containers of pasta at the time Savino seized them.  Savino argues that Delverde owned the pasta pursuant to the terms of the Purchase Agreement that governed the sale of the pasta by Delverde to Italverde. In contrast, Italverde argues that it owned the pasta at the time it was seized because (1) the bills of lading identify Italverde as the owner and such bills of lading create a presumption of

ownership, (2) a UCC provision prohibiting sellers from retaining the title to goods prevents a literal application of the Purchase Agreement, and (3) a course of dealing between Delverde and Italverde somehow established that Italverde owned the pasta.[4]

Savino is correct that only Italverde brings a claim for conversion. Even though Rules 8 and 12 of the Federal Rules of Civil Procedure require this court to read the Complaint liberally, the Complaint unequivocally establishes that only Italverde brings a claim for conversion. The conversion claim is addressed in paragraphs 45 through 56. Paragraphs 46, 47 and 50 allege that Italverde owned the pasta containers at the time they were seized. Paragraphs 48, 49, 51 and 52 allege that Savino wrongfully seized the pasta from Italverde and refused Italverde's demands that the pasta be delivered to it. Paragraphs 53 through 56 allege that Savino's conduct intentionally or recklessly interfered with Italverde's property interest in the pasta and caused Italverde to suffer damages. At no point in the Complaint section addressing the conversion claim does Delverde allege that Savino interfered with its rights or that it suffered harm. Further, at no point in its lengthy motion papers does Delverde assert that it is bringing or wishes to bring a claim for conversion.[5] As a result, this court reads the Complaint to state a claim for

---

[4] In its motion papers, Savino asserts that Plaintiffs are relying upon the International Chamber of Commerce's International Commerce Terms ("INCOTERMS") in establishing whether Delverde or Italverde had title to the pasta at the time it was seized. (Def. Mem. at 7-9.) Irrespective of whether Plaintiffs, at some earlier point in the litigation, asserted that the INCOTERMS governed ownership of the pasta, Plaintiffs are not making such an argument at this time. (Pl. Opp. at 11 ("Savino [ ] is incorrect in stating that plaintiffs rely on INCOTERMS to establish Italverde's title. The INCOTERMS . . . do not govern passage of title.") (internal citation omitted).)

[5] In light of the lengthy briefing on this issue and Delverde's failure to assert that it too has brought or would like to bring a claim for conversion, the court concludes that Delverde has intentionally decided not to bring a claim for conversion, presumably because it believes that there would be a meritorious defense to such a claim.

conversion only on behalf of Italverde.

Determining whether Delverde or Italverde owned the pasta at the time it was seized requires an analysis of the Purchase Agreement between Delverde and Italverde. Delverde and Italverde entered into a written agreement titled Agreement Regarding Purchase of Products and Related Matters ("Purchase Agreement") dated December 12, 2002. Paragraph 5 of the Agreement states that

> [Delverde] and Italverde hereby agree that title to, and the risk of loss of theft, damage or destruction to the Products shall remain with [Delverde] until due delivery and tender by [Delverde] of conforming Products to Italverde in the Territory, at the location designated by Italverde.

(Mason Aff. Ex. F ¶ 5(g); Def. 56.1 ¶ 20; Pl. 56.1 Resp. ¶ 20.) The Agreement defines the term "Territory" as the United States and other countries in the Americas. (Mason Aff. Ex. F ¶ 5(e).) The agreement also provides that the "parties may amend, modify and supplement this Agreement only by a written instrument executed by all of the parties hereto with the same formality as this Agreement." (Mason Aff. Ex. F ¶ 8(c).)

As a preliminary matter, the court must determine which law governs the Purchase Agreement. The Purchase Agreement provides that "[t]his Agreement shall be governed by and construed and enforced exclusively and solely in accordance with the internal laws of the State of New Jersey." Mason Aff. Ex. F ¶ 8(a). Neither party cites this provision or New Jersey State law in their lengthy briefing on the issue of how the Purchase Agreement should be read. Italverde primarily cites to the Uniform Commercial Code ("UCC"), though it also cites to New York courts' reading of the UCC. (See, e.g. Plaintiffs' Memorandum in Opposition to Defendant's Cross-Motion for Partial Summary Judgment ("Pl. Opp.") at 5-12.) Savino argues

that "Italverde never explains **why** the U.C.C. should apply.  It simply cites to the U.C.C., without reference even to any particular state's version of the U.C.C."  (Defendant Savino Del Bene USA, Inc.'s Reply Brief ("Def. Rep.") at 2-3 (emphasis in original).)  However, Savino does not appear to take any affirmative position as to which state's or nation's law governs the Purchase Agreement.

"New York law is clear in cases involving a contract with an express choice-of-law provision:  Absent fraud or a violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction."  Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 393 (2d Cir. 2001) (internal quotations omitted).  The parties have not argued—or otherwise provided any basis for concluding—that the Purchase Agreement is the result of fraud or that construing the agreement under New Jersey law would violate public policy.  Further, the Purchase Agreement and the parties to it have significant contacts with New Jersey.  Italverde is incorporated and "located" in New Jersey.  (Compl. ¶ 12.)  Italverde keeps at least some of its Delverde brand pasta in a Florence, New Jersey warehouse, from which it fills customer orders.  (See Sellitto Aff. at page 2.)  At least some of the pasta at issue in this case was supposed to be shipped to the Port of New Jersey.  (Mason Aff. Ex. G ¶ 2(a).)  These contacts with New Jersey are sufficient to apply New Jersey law to the Purchase Agreement dispute.  See Woodling v. Garrett Corp., 813 F.2d 543, 552 (2d Cir. 1987) (contractual Connecticut choice of law provision honored where one of parties to contract had principal place of business in Connecticut); L-3 Communications Corp. v. OSI Sys., No. 02 Civ. 9144 (DC), 2004 WL 42276, at *3 (S.D.N.Y. Jan. 8, 2004) (contractual New York choice of law provision honored where one of parties had principal place of business in New York).

The court is mindful of the Second Circuit's decision in <u>Cap Gemini Ernst & Young,</u> <u>U.S., L.L.C. v. Nackel</u>, 346 F.3d 360, 366 (2d Cir 2003). In <u>Cap Gemini</u>, the court remanded the case for further factfinding on the choice of law issue where the only contacts between the contract and New York (New York law selected in a contractual choice of law provision) was that one of the parties to the contract had a New York "headquarters." <u>Id.</u> The court explained that New York law would apply if one of the parties' principal place of business was in New York, but that the fact that one of the parties had a New York headquarters was insufficient to determine the extent of the party's presence in New York. The instant case is easily distinguishable from <u>Cap Gemini</u> as Italverde is incorporated and "located" in New Jersey. On this basis, I find that Italverde's principal place of business is New Jersey. Further, the fact that some of the goods that were the subject of the Purchase Agreement were delivered to the Port of Newark and stored in a warehouse located in New Jersey also distinguishes the instant case from <u>Cap Gemini</u>. As a result, this court finds that New Jersey law governs the interpretation of the Purchase Agreement.

Specifically, New Jersey's version of Article II of the Uniform Commercial Code ("UCC") governs the Purchase Agreement. Article II governs contracts for the sale of goods. N.J.S.A. § 12A: 2-101. Further, Plaintiffs cited to the UCC in their motion papers and Savino failed to argue that the UCC does not apply. (Pl. Opp. Br. at 6-12. <u>Cf.</u> Def. Rep. Br. at 2-3 ("Italverde never explains **why** the U.C.C. should apply. It simply cites to the U.C.C., without reference even to any particular sate's version of the U.C.C.").

The four corners of the Purchase Agreement makes clear that Delverde would continue to hold title to the pasta until it was delivered and tendered to Italverde in the United States (or

other pertinent nation in the Americas). (Mason Aff. Ex. F ¶ 5(g).) Although there may be a factual dispute as to precisely where the pasta was located at the time Savino seized it, no party asserts that the pasta was delivered and tendered to Italverde before it was seized. As a result, under the terms of the Purchase Agreement, Delverde held title to the pasta at the time it was seized by Savino.

Italverde offers three reasons as to why Italverde held title to the pasta at the time it seized. Each of these arguments are considered in turn. First, Italverde argues that it was the presumptive owner of the pasta at the time the pasta was seized because (a) the relevant bills of lading identified it as the consignee of the pasta and (b) the consignee is the presumptive owner of merchandise described on a bill of lading. (Pl. Opp. Br. at 5-6.) Even if Italverde is correct that the identification of an owner on a bill of lading gives rise to a presumption that the identified owner actually owns the goods described on the bill, "[b]ills of lading are contracts between shippers and carriers that spell out the carrier's obligation to deliver specific goods to specific people or places." Int'l Knitwear Co. v. M/V Zim Canada, No. 92 Civ. 7508 (PKL), 1994 WL 924203, at *3 (S.D.N.Y. Oct. 6, 1994). As the bills of lading are contracts between shippers and carriers, they do not govern the transfer in title vis-a-vis the buyer and seller—in this case Delverde and Italverde.

Even if the bills of lading at issue in this case governed the transfer of goods between Delverde and Italverde, they still would not have effectively modified the Purchase Agreement. The Purchase Agreement provides that Delverde and Italverde "may amend, modify and supplement this Agreement only by all of the parties hereto with the same formality as this Agreement." (Mason Aff. Ex. F ¶ 8(c).) New Jersey Statute Section 12A:2-209(2) provides that

15

"[a] signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party." As the bills of lading were not written agreements executed by the parties (Sellitto Aff. Attachment 4), as a matter of law, they are not capable of modifying the Purchase Agreement. See Green Constr. Co. v. First Indemnity of Am. Ins. Co., 735 F. Supp. 1254, 1261 (D.N.J.), aff'd, 935 F.2d 1281 (3d Cir. 1991) ("There being no writing, I conclude that as a matter of law there could not be a valid modification because the [ ] contract specifically provided that '[c]hanges will be binding only if in writing duly executed by the Purchaser[.]'").

Second, Savino argues that pursuant to UCC Section 2-401, codified at N.J.S.A. Section 12A:2-401, the Purchase Agreement provision providing that transfer of title occurs at the time the pasta is delivered and tendered to Italverde in the United States confers a security interest in—as opposed to title in—pasta that is in transit on Delverde. Under Section 2-401(1), "[a]ny retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest." N.J.S.A. § 12A:2-401(1). Simultaneously, Section 2-401(2) provides:

> Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest in a bill of lading . . . (b) if the contract requires delivery at destination, title passes on tender there.

N.J.S.A. § 12A:2-401(2). As these two provisions are part of the same section, they must be

read together. The text of subsection (1) limits a seller's ability to retain title *after the goods have been delivered to the buyer*: "retention or reservation by the seller of title [ ] in goods *shipped* or *delivered* to the buyer is limited in effect to a reservation of a security interest." N.J.S.A. § 12A:2-401(1) (emphasis added). In contrast, the text of subsection (2) makes clear that, in those cases where the seller agrees to deliver the goods to the buyer, the buyer does not obtain title until such time as the goods are delivered to the buyer: "title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods . . . if the contract requires delivery at destination, title passes on tender there." N.J.S.A. § 12A:2-401(2). See In re Crysen/Montenay Energy Co., 902 F.2d 1098, 1101-02 (2d Cir. 1990) (pursuant to UCC Section 2-401, where the contract requires the seller to deliver the goods to a particular destination, title to the goods passes to the buyer at the time the goods are delivered to the destination); MEI Int'l v. Schenkers Int'l Forwarders, Inc., 807 F. Supp. 979, 987 n.2 (S.D.N.Y. 1992) ("Under UCC § 2-401(2), title to goods passes at the time and place that the seller completes performance with respect to the physical delivery of the goods. The contract between [buyer] and [seller] required [buyer] to accept delivery of the goods in a foreign trade zone or in Panama. Consequently, had the contract been performed as contemplated by [buyer] . . . [buyer] would have received title when the goods were delivered to the foreign trade zone[.]"). Under the terms of the Purchase Agreement, Delverde did not retain title past the time at which it completed delivery to Italverde and, as a result, Section 2-401(1) simply does not apply.

Savino mistakenly relies upon Usinor Industeel v. Leeco Steel Products, Inc., 209 F. Supp. 2d 880 (N.D. Ill. 2002). In Usinor, the contract provided that the seller retained title to the

goods until such time as payment was made. Id. at 882. The court held that, pursuant to Section 2-401, seller's "retention of title in the contract did not effectively retain title in [seller]. Rather, transfer of title was effected upon delivery to [buyer]." Id. at 887. Usinor correctly reads Section 2-401 to state that in the event that a contract for the sale of goods provides that the seller retains title to the goods past the time of delivery to buyer, (1) title is transferred to the seller at the time the goods are delivered to and tendered to the buyer and (2) after the transfer of title to the buyer, the seller retains a security interest in the goods. Nothing about Usinor's reading of UCC Section 2-401 in any way suggests that Italverde obtained title to the goods before the goods were delivered and tendered to Italverde.

Similarly, in Hong Kong and Shanghai Banking Corp, Ltd. v. HFH USA Corporation, 805 F. Supp. 133, 142 (W.D.N.Y. 1992)—also relied upon by Italverde—the court read UCC Section 2-401 to mean that title passed to the buyer at the time and place that the seller delivered and tendered the goods to the buyer: "Two things in [UCC Section 2-401] are worthy of note. First, title retention contracts are construed as creating only security interests under the U.C.C. . . . Second, title to goods passes when the seller fulfills his obligation to deliver the goods to the place identified in the contract." As a result, nothing about Section 2-401(1) in any way suggests that Italverde obtained title to the pasta before the pasta was seized by Savino; in fact, Section 2-401(2) would ordinarily confirm that Delverde continued to hold title to the pasta at the time it was seized by Savino.

Third, Savino argues that a course of dealing between the parties somehow changed the obligations between the parties concerning when and where delivery would be made and when title would shift from Delverde to Italverde. Specifically, Italverde argues that the contract was

18

modified when (1) Italverde sent customer invoices that constituted purchase orders for pasta to Delverde and (2) Delverde responded by delivering pasta under the delivery term "CIF" or "cost of goods, freight, and insurance." (See Sellitto Aff. Attachment 4.) CIF is a trade term which means that "[t]he seller is responsible for paying the cost, freight and insurance coverage necessary to bring the goods to the named port of destination." St. Paul Guardian Ins. Co. v. Neuromed Med. Sys. & Support, No. 00 CIV. 9344 (SHS), 2002 WL 465312, at *4 (S.D.N.Y. Mar. 26, 2002); see also N.J.S.A. § 12A:2-320 ("The term C.I.F. means that the price includes in a lump sum the cost of the goods and the insurance and freight to the named destination.") Italverde argues that it never objected to the inclusion of the CIF term in the purchase orders. Italverde also points to the fact that Francesco Schettini of Italverdi testified that he understood that title passed to Italverde at the time the "containers were positioned on the ship, meaning port of departure or whatever, Naples or whatever it was." (Schettini Dep. at 54.)

As discussed above, the purchase orders and associated course of performance between Italverde and Delverde are not capable, as a matter of law, of modifying the Purchase Agreement because they are not writings executed by both parties. See N.J.S.A. § 12A:2-209(2); Green Constr. Co., 735 F. Supp. at 1261. The cases cited by Italverde for the proposition that courts look to the course of performance between the parties are inapposite as they do not involve comprehensive contracts requiring that all modifications be in writing and fully executed by both parties. See Hyosung America, Inc. v. Sumagh Textile Co., 137 F.3d 75, 80 (2d Cir. 1998) (course of performance determined obligations between the parties in the absence of a comprehensive agreement prohibiting oral modification); CT Chemicals (U.S.A.) Inc. v. Vinmar Impex, Inc., 81 N.Y.2d 174 (1993) (same).

Although a course of performance cannot modify an agreement containing a no-oral-modification clause, it can operate as a waiver.  <u>See</u> N.J.S.A. § 12A:2-209(4) ("Although an attempt at modification" that does not observe the formalities required by a no-oral modification clause cannot effect a modification, it "can operate as a waiver"); <u>Cassidy Podell Lynch, Inc. v. Snydergeneral Corp.</u>, 944 F.2d 1131, 1147 (3d Cir. 1991) (provision in agreement for sale of goods containing no-oral-modification clause was waived through a course of performance); <u>Green Constr.</u>, 735 F. Supp. at 1261-62 (attempted oral modification can constitute a waiver of an agreement containing a no-oral-modification clause).  "Such waiver must be demonstrated by more than mere parol evidence; course-of-performance/conduct evidence indicating a waiver is necessary."  <u>Green Constr.</u>, 735 F. Supp. at 1262.  It is possible that, through a course of performance, Italverde waived its right to receive delivery and tender of the goods from Delverde in the United States.

Although Italverde has introduced enough evidence to create a material question of fact as to whether the Purchase Agreement provision stating that Italverde would not gain title to the pasta until Italverde received it in the United States had been waived, Italverde is not entitled to judgment as a matter of law.  Italverde relies on two pieces of evidence in support of its course of performance argument.  First, Italverde points to the shipping invoices which used the delivery term "CIF" or "cost of goods, freight, and insurance."  (<u>See</u> Sellitto Aff. Attachment 4.)  Italverde argues that Delverde routinely placed this term in the invoices and Italverde never objected to it.  Whether the inclusion of the CIF term on the invoices provides evidence that the parties intended title to shift to Italverde at the time the goods were delivered to the shipper depends on whether the parties understood the term to be used within the meaning of the

INCOTERMS or the UCC. CIF within the meaning of the INCOTERMS does not govern change in title. (See Pl. Opp. Br. at 11 ("The INCOTERMS define CIF as a term of delivery but do not govern the passage of title"); see also St. Paul Guardian, 2002 WL 465312, at *4 ("INCOTERMS, however, only address passage of risk, not transfer of title.").) However, if Italverde and Delverde used CIF within the meaning of the UCC, it provides evidence that the parties waived the Purchase Agreement term providing that transfer of title occurred when Italverde received the goods. See N.J.S.A. § 12A:2-320 Comment 1 (Under the term CIF, "[d]elivery to the carrier is delivery to the buyer for purposes of risk and title"). Delverde apparently understood that the term CIF was used as the term is meant under the INCOTERMS. (See Def. Rep. Ex. 1, Plaintiffs' Response to Defendant's First Set of Interrogatories and Document Requests at Question 4(a); Schettini Dep. at 55:21-24 (Delverde told Schettini that the INCOTERMS govern the title to the pasta).)

Second, Italverde CEO Francesco Schettini testified that he understood that title passed to Italverde at the time the "containers were positioned on the ship, meaning port of departure or whatever, Naples or whatever it was." (Pl. 56.1 Ex. T (7/14/05 Deposition of Francesco Schettini) at 54.) When asked for the basis of this understanding, Schettini testified "that that's what I have always been told" by Italverde. (Id.) This evidence suggests that Italverde believed that title to the pasta changed hands at the time the pasta was delivered to the Italian port of departure and suggests that a waiver may have occurred.

Plaintiffs have not directed the court to any evidence in the record that the inclusion of the CIF term in the invoices was actually honored by Delverde and Italverde. In other words, there is no evidence as to (1) which entity bore the loss if there was any occasion on which the

goods were stolen or damaged and (2) whether either of the parties made acts or omissions in reliance on the CIF term.

In short, the mere facts that (1) Delverde included the phrase "CIF" on its shipping invoices, (2) Italverde did not object, and (3) one Italverde officer has testified that he understood that title was transferred at the time the goods were in transit are insufficient to establish as a matter of law that the Purchase Agreement provision governing transfer in title was waived. At trial, Plaintiffs will have the burden of proving that the Purchase Agreement term governing transfer of title was waived through a course of performance.

### D. Tortious Interference with Contract

Both Plaintiffs and Savino assert that they are entitled to summary judgment on the third claim for tortious interference with contract. Plaintiffs assert that they have established all of the elements of the claim as a matter of law. In opposing Plaintiffs' motion for summary judgment and supporting its own motion for summary judgment, Savino only makes two arguments: (1) Plaintiffs have failed to create a material question of fact as to whether any third party (i.e. any of Italverde's customers) was induced to breach a contract with Italverde; and (2) Savino has established the defense of economic justification because it held a general lien on the pasta. For the reasons described below, both parties' summary judgment motions with respect to this claim are denied.

With respect to Savino's first argument, the parties vigorously dispute whether Italverde must establish that Savino induced a third party to breach a contract with Italverde in order for Italverde to prevail on this claim. Embedded in this argument are two separate issues: whether Plaintiffs must establish that (a) a contract to which at least one of the Plaintiffs was a party was

actually breached—as opposed to some lesser form of interference with the performance of the contract that does not amount to a breach—and/or (b) that a third party—as opposed to Plaintiff(s)—breached a contract to which at least one of the plaintiffs was a party. Both parties point to conflicting language with respect to both of these issues in relatively recent New York Court of Appeals cases. Cf. Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424 (1996) ("Tortious interference with contract requires . . . ***defendant's intentional procurement of the third-party's breach of the contract without justification***") (emphasis added) with Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 94 (1993) ("The tort of inducement of breach of contract, now more broadly known as interference with contractual relations, consists of four elements: . . . (3) defendant's intentional inducement of the third party to breach ***or otherwise render performance impossible***") (emphasis added).

A closer reading of the New York Court of Appeals cases, however, clearly indicates that, on those occasions on which the Court of Appeals has explicitly reached the question of whether the plaintiff is required to show that the contract was actually breached, such a showing is in fact required. See NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc., 87 N.Y.2d 614 (1996) (finding that the "controversy center[ed] on . . . whether breach of contract is essential to a claim for tortious interference with contractual relations" and holding that "[e]ver since tortious interference with contractual relations made its first cautious appearance in the New York courts . . . our Court has repeatedly linked availability of the remedy to breach of contract"); Jack L. Inselman & Co. v. FNB Fin. Co., 41 N.Y.2d 1078 (1977) (holding that defendant was entitled to summary judgment on tortious interference with contract claim because plaintiff failed to establish a breach of contract). As a result, there is no question that

Plaintiffs are required to establish that a contract was breached in order to prevail on this claim.

There is no clear Court of Appeals precedent, however, determining the related question of whether a plaintiff must show that the defendant caused a third party to breach a contract—as opposed to showing that a defendant caused the plaintiff to breach the contact. In <u>Jack L. Inselman</u>, for instance, the Court of Appeals held that the tortious interference claim must be dismissed where the defendant caused the third party to fail to fulfill its obligations under the contract only after the plaintiff had repudiated the contract. <u>Jack L. Inselman</u>, 41 N.Y.2d at 1080. Because plaintiff repudiated the contract before the third party failed to perform its duty under the contract, the third party was legally incapable of having breached the agreement. The court concluded that "[i]n order for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of that contract by the other party, a situation not here present." <u>Id.</u> (internal citations omitted). However, in <u>Jack L. Inselman</u>, the defendant did not cause the plaintiff to repudiate the contract—the plaintiff's repudiation was entirely unrelated to the defendant's conduct. As a result, the <u>Jack L. Inselman</u> court was not confronted with the question of whether a tortious interference claim would lie in a case where the defendant's conduct had caused the plaintiff to breach the contract. Thus, the court's statement that the "breach of the contract [must be] by the other party" is mere *dicta*. Similarly, nothing in <u>NBT Bancorp</u> clarifies this issue.

The New York Court of Appeals has cited to the Restatement (Second) of Torts in defining the contours of a claim for tortious interference with a contract. <u>See</u>, <u>e.g.</u>, <u>Kronos</u>, 81 N.Y.2d at 94; <u>Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.</u>, 50 N.Y.2d 183, 189-96 (1980). Restatement (Second) of Torts Section 766A is titled "Intentional Interference With

Another's Performance Of His Own Contract" and provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

As discussed above, the Court of Appeals has clearly rejected the portion of this section which states that the tort lies in certain cases where there was no breach of contract, i.e. by "causing the [plaintiff's] performance to be more expensive or burdensome." See also Burns Jackson Miller Summit & Spitzer v. Lindner, 59 N.Y.2d 314, 722 (1983) (declining to reach the question of whether New York should adopt the portion of 766A which permits a cause of action for merely making performance more expensive or burdensome and noting that "[n]o New York cases recognizing such a cause of action has been cited or has been found by us."); D'Andrea v. Rafla-Demetrious, 146 F.3d 63, 66 (2d Cir. 1998) ("Absent such authority [supporting Section 766A], we decline to hold that the New York Courts would recognize [a Section 766A] exception to the rule requiring 'actual breach' in order to state a claim for tortious interference with contractual relations.").

Based on this court's independent research, however, those few New York state courts to have considered the issue have held that causing a plaintiff to breach a contract by preventing the plaintiff's performance constitutes tortious interference with a contract, provided that the other elements of the tort are satisfied. See Stiso v. Inserra Supermarkets, Inc., 179 A.D.2d 878, 880 (3d Dep't), cert. denied 80 N.Y.2d 757 (1992) (defendant's exclusion of plaintiff-sales representative from its stores constituted tortious interference with plaintiff's exclusive

distribution contract with distributor); <u>Morris v. Blume</u>, 55 N.Y.S. 2d 196, 199 (Sup. Ct. N.Y.

Cy. 1945), <u>aff'd</u>, 264 A.D.832 (1st Dep't 1945) (holding that "[a]n unlawful interference with a

person in the performance of his contract with a third party is just as much a legal wrong as is an

unlawful inducement of a breach of contract by the third party.").

Further, the Comment to Section 766A explains the rationale for permitting tortious

interference claims in those cases where (1) the defendant causes the plaintiff to breach the

contract (addressed in Section 766A) and (2) the defendant induces a third party to breach the

contract (addressed in Section 766):

> This Section and §766 both involve interference with an existing
> contract. Under § 766, the plaintiff's interest in obtaining
> performance of the contract is interfered with directly. Under this
> Section the interference is indirect, in that the plaintiff is unable to
> obtain performance of the contract by the third person because he
> has been prevented from performing his part of the contract and
> thus from assuring himself of receiving the performance by the
> third person. But the interference with receiving the benefits of
> obtaining the performance is just as real as in a case coming under
> § 766.

Restatement (Second) of Torts § 766A, Comment (c). The court finds this reasoning persuasive.

Thus, when it is coupled with the fact that New York courts to have considered the issue have

concluded that a defendant who causes a plaintiff to breach a contract is liable for tortious

interference with the contract—provided the other elements of the tort are met—I conclude that

Plaintiffs have introduced more than sufficient evidence to create a material question of fact as to

whether Savino induced Plaintiffs' breach of pasta contracts with Plaintiffs' customers.

In a two-sentence argument, Savino asserts that it has established the defense of

economic justification as a matter of law. Savino is correct that, under New York law, economic

justification is a defense to a claim for tortious interference with a contract. <u>Foster v. Churchill</u>,

87 N.Y.2d 744, 750 (1996). "[P]rocuring the breach of a contract in the exercise of equal or superior right is acting with just cause or excuse and is justification for what would otherwise be an actionable wrong." Id. (internal quotations omitted). However, even if a defendant can prove the economic justification defense, the defendant is liable for the tortious interference claim if the plaintiff can prove "malice on the one hand, or fraudulent or illegal means on the other." Id.

The ultimate success of the economic justification defense depends on many of the issues discussed below in section II(G). Though the issue has not been fully briefed, if Savino can prove that it was entitled to seize the goods in the manner that it did, Savino may very well establish an economic justification defense. See id. at 751 (economic justification defense established where defendants actions were justified by economic considerations even though defendants did not act in good faith). That being said, it is possible that Plaintiffs may be able to defeat the defense if they can prove that Savino's conduct was fraudulent, illegal, or the result of malice. Again, although the issue has not been briefed, Plaintiffs have alleged other conduct—including threatening to sell the pasta at below-market prices in order to disrupt the market for Delverde pasta and disclosing confidential information to customers—that may be illegal, fraudulent, or the result of malice. Similarly, Plaintiffs have adduced evidence that Savino substituted itself as importer of record on official government documents for at least some of the pasta shipments in its possession. (Pl. 56.1 ¶ 15; Def. 56.1 Resp. ¶ 15.) This may (or may not) have constituted fraud. As a result, both motions for summary judgment with respect to the tortious interference with contract claim are denied.

### E.     Tortious Interference with Prospective Business Relations

Savino next moves for summary judgment on Plaintiffs' claim that Savino tortiously

interfered with prospective business relations.  The Second Circuit recently explained the

applicable standard:

> Under New York law, to state a claim for tortious interference with
> prospective economic advantage, the plaintiff must allege that (1)
> it had a business relationship with a third party; (2) the defendant
> knew of that relationship and intentionally interfered with it; (3)
> the defendant acted solely out of malice, or used dishonest, unfair
> or improper means; and (4) the defendant's interference caused
> injury to the relationship."

Kirch v. Liberty Media Corp., 449 F.3d 388, 400 (2d Cir. 2006) (internal quotations omitted).

Plaintiffs argue that they are not required to prove that defendant had "specific

knowledge" of the prospective contractual relations.  (Pl. Opp. at 16.)  Plaintiffs rely on cases

which do omit reference to any specific element requiring the defendant's knowledge of the

prospective relations.  See Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183,

190-91 (1980); Nadel v. Play-by-Play Toys & Novelties, Inc., 208 F.3d 368, 382 (2d Cir. 2000);

Purgess v. Sharrock, 33 F.3d 134, 141-42 (2d Cir. 1994).[6]  However, these cases are inapposite.

In Purgess, 33 F.3d at 137, 141-42, although the court failed to specifically cite defendant's

knowledge of the prospective relations as an element of the tort, the facts of the case make clear

that the defendants knowingly made misrepresentations about the plaintiff's qualifications to

employers who were considering hiring the plaintiff.  As a result, in Purgess, it was clear that the

---

[6] Plaintiffs also cite PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc., 818 F.2d
266, 269-70 (2d Cir 1987).  The Second Circuit has found that PPX Enterprises's description of
the elements of tortious interference with business relations was an "apparently incorrect
characterization of New York law."  Scutti Enterprises, LLC v. Park Place Entertainment Corp.,
32 F.3d 211, 216 (2d Cir. 2003) (internal quotations omitted).

defendants had knowledge of the prospective relationships.

The remaining cases are equally unhelpful in resolving the issue. In Guard-Life, the New York Court of Appeals was only confronting a claim for intentional interference with contract as opposed to tortious interference with business relations. Similarly, the Nadel court found that the defendant was entitled to summary judgment on a tortious interference with business relations claim on grounds that were unrelated to the defendant's knowledge—plaintiff failed to establish that one alleged relationship actually existed and that defendant's conduct caused an interruption of another business relationship. In light of the Second Circuit's clear and recent statement in Kirch that plaintiff must show the defendant had knowledge of the business relations in order to prevail on a claim for tortious interference with business relations, I find that Plaintiffs must make such a showing in order to prevail on this claim. In any event, as discussed below, in this case, Plaintiffs have introduced sufficient evidence of Savino's knowledge of relationships with third parties to withstand summary judgment.

Savino argues that Plaintiffs have failed to create a material question of fact as to whether: (1) Savino knew of any business relationship between Italverde and a third party; (2) Savino intentionally interfered with a prospective contract; (3) but for Savino's interference, a proposed contract would have been consummated; (4) Savino's alleged interference was "wrongful"; and (5) Savino's conduct was the proximate cause of Italverde's damages. For the reasons described below, Defendants' motion is denied. Each of Savino's arguments for summary judgment on this claim will be considered in turn.

First, there is a material question of fact as to whether Savino knew of the business relationships between Italverde and its customers. There is no question that Defendants

possessed invoices for the pasta that constituted actual or potential contracts between Italverde and its customers—including the owners of stores such as Shoprite and Costco. (Sigrist Dep. at 25-27; Sellitto Aff. Attachment 4.) Because of the nature of their large-scale retail businesses, the stores identified on the invoices are inherently likely to be repeat customers of the pasta products manufactured and distributed by Plaintiffs. (See Sellitto Aff. at page 3 ("Generally, Costco obtains pasta which Italverde makes available at the Holman Distribution Center, a warehouse in Washington.").) As a result, these invoices, in and of themselves, are sufficient to create an inference that Savino had knowledge of Plaintiffs' ongoing business relationships with its retailers. Further, Savino manager Marco Sigrist testified that, in a telephone conversation with Columbus Foods, without Columbus Foods having raised the issue of future pasta shipments, Sigrist went out of his way to state, "I was not in any way interested in doing any function in terms of providing additional pasta." (Savino Dep. at 28.) The fact that Sigrist specifically raised the issue of prospective pasta sales further suggests that this was an industry in which many customers were long-time buyers, and that Savino had actual knowledge of Plaintiffs' prospective business relationships with its customers.

Second, Plaintiffs have created a material question of fact as to whether: (a) Savino intentionally interfered with a prospective economic relationship; and (b) the interference caused the loss of an economic relationship. Plaintiffs argue that "Savino interfered with Italverde's business relations by delaying the delivery of pasta to Italverde's customers, contacting Italverde's customers directly, inaccurately characterizing the legal status of Delverde's purported 'debt' to Savino Italy, and offering to 'sell' them merchandise that they had already contracted to buy." (Def. Opp. at 17.) The court need not consider all of these arguments since

30

Plaintiffs have created a material question of fact as to whether the delays caused by Savino interfered with its prospective relations with Costco and Wakefern General Merchandise.

Plaintiffs have introduced evidence demonstrating that Savino's seizure of the pasta interfered with Italverde's ability to deliver the pasta to its customers in late May and early June. (Sellitto Aff. at pages 2-3 ("Despite my best efforts and those of Mr. Schettini at Italverde, Italverde was not able to deliver the penne to Costco because Savino USA refused to release the containers in which it was located").) Further, in an E-mail, Costco's broker advised Italverde that "even if the legal issue is resolved on Mon/Tues of next week, it is [the Costco buyer's] intention to cancel the outstanding orders due to the ongoing delays and out-of-stocks that have resulted from them." (Pl. 56.1 Ex. S at 736.) Similarly, Plaintiffs have introduced evidence that Savino's conduct interfered with Italverde's relationship with Wakefern by causing Wakefern to limit the types of pasta which Wakefern purchases from Italverde. (Sellitto Aff. at page 5.)

Third, Plaintiffs have introduced sufficient evidence to create a material question of fact as to whether Savino's conduct was sufficiently "wrongful" to constitute tortious interference with contractual relations. The New York Court of Appeals has made clear and Savino concedes (Def. Mem. at 16-17) that conduct that qualifies as an independent tort is sufficiently "wrongful" to qualify as tortious interference with prospective economic relations. See Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190 (2004) (conduct that constitutes an independent tort satisfies the wrongfulness element of tortious interference with business relations). As Plaintiffs have created a material question of fact as to whether Defendants' seizure of the goods constituted conversion, the Plaintiffs have satisfied this element.

Finally, Plaintiffs have created a material question of fact as to whether Savino's conduct

caused them damages. Plaintiffs have introduced a valuation of damages caused by Savino that was prepared by Plaintiffs' expert, Fabio D'Angelo. (Pl. 56.1 Ex. Q.) As the parties have not specifically briefed the issue of which categories of damages described in the valuation are recoverable, the court, at this time, will only conclude that D'Angelo's valuation of the damages resulting from Costco's cancellation of orders in the first half of 2004 creates a material question of fact as to damages. (Id. at 502.) Even if the Costco orders that had been placed amount to existing contracts that do not qualify as damages for the instant claim for interference with prospective contractual relations, D'Angelo values prospective orders that were lost "following the termination of the business relationship with the customer Costco." (Id. at 503.) Thus, Plaintiffs have created a material question of fact with respect to their interference with prospective business relations claim, and Savino's motion for summary judgment with respect to this claim is denied.

**F.      Breach of Fiduciary Duty**

Plaintiffs move for summary judgment on the fifth claim in their complaint, breach of fiduciary duty. Savino in no way opposes Plaintiffs' claim that, as Delverde's customs broker, it owed Delverde a fiduciary duty. (Def. Opp. at 15 ("Assuming that as a general proposition a customs broker owes a fiduciary duty to its principal. . . ."). Instead, Savino argues that: (1) there is a material question of fact as to when and where Savino seized the goods; (2) there is a material question of fact as to in what capacity Savino was acting at that time of the seizure; (3) Savino possessed a general lien on the goods and, in some unspecified way, this affected Savino's fiduciary duties; and (4) the fiduciary duties Savino owed to Plaintiff(s) were terminated when Delverde revoked the Power of Attorney. Savino cites legal precedent only in

support of the argument that its fiduciary duties terminated at the time Delverde revoked the Power of Attorney.

Savino has failed to adequately brief its argument that it possessed a general lien over the pasta. Plaintiffs' reply brief presents a number of significant arguments as to why Savino did not possess a lien and Savino has not had a chance to respond. As discovery is now complete[7] and denying Plaintiffs' motion for summary judgment with respect to the claim for breach of fiduciary duty will in no way complicate the trial, the court will deny Plaintiffs' motion with respect to this claim without prejudice to Plaintiffs and Savino raising at trial any of the arguments raised in their motion papers.

### G.    Trademark Infringement

Plaintiffs and Savino move for summary judgment with respect to the trademark infringement claim. In order to prove trademark infringement under the Lanham Act, the plaintiff must show: "it has a valid trademark entitled to protection and that the defendant's use of it is likely to cause confusion of an appreciable number of ordinarily prudent purchasers as to the source of goods or services in question." Information Superhighway, Inc. v. Talk America, 395 F. Supp. 2d 44, 50 (citing Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1075 (2d Cir. 1992); see also Time, Inc. v. Peterson Publ'g Co. L.L.C., 173 F.3d 113, 117 (2d Cir. 1999) (stating that Gruner test is applicable to claims brought under 15 U.S.C. § 1114(1) and 15 U.S.C. § 1125(a)). Plaintiffs have obviously satisfied the first element of the trademark claim—and Savino does not challenge this conclusion. Instead, Savino argues that Plaintiffs

---

[7] See November 4, 2005 Minute Entry (Docket #48) (fact discovery is complete, deadline for expert disclosures was December 15, 2005, and expert depositions may occur at any time prior to trial).

have failed to adduce any evidence of consumer confusion.  (See Def. Opp. at 10.)

For purposes of Savino's motion for summary judgment, the court must resolve all factual disputes and draw all reasonable inferences in favor of Plaintiffs and, in doing so, assume that Savino's sale of the pasta was unauthorized.  The Second Circuit has clearly held that, even where a defendant makes an unauthorized sale of a trademarked good, the plaintiff must still prove consumer confusion in order to recover damages.  See Polymer Tech. Corp. v. Mimran, 37 F.3d 74, 80 (2d Cir. 1994) ("Regardless of the presence or absence of a contractual restriction, a distributor's failure to observe a restrictive condition on the sale of a product can only constitute a trademark infringement if the trademark owner can prove consumer confusion, the hallmark of any trademark infringement claim"); H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc., 879 F.2d 1005, 1023-24 (2d Cir. 1989) (holding that "[Second Circuit] cases do not contravene the district court's conclusion that the unauthorized sale of a trademarked article does not, without more, constitute a Lanham Act violation."); Ryan, 107 F. Supp. 2d at 381; see also Matrix Essentials, Inc. v. Emporium Drug Mart, Inc. of Lafayette, 988 F.2d 587, 590 (5th Cir. 1993) ("[T]he general rule is that trademark law does not apply to the sale of genuine goods bearing a true mark, even if the sale is without the mark owner's consent.") (internal quotations omitted).

Plaintiffs' only argument that Savino's sale of the pasta caused consumer confusion is that consumers were improperly led to believe that Savino was an authorized distributor of Delverde pasta products.  In H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc., the Second Circuit adopted the standard set forth in Stormer, A Div. of Gugua Indus. v. Johnson, 487 F. Supp. 275 (W.D. Mich. 1984), and Bandag, Inc. v. Al Bolser's Tire Stores, Inc.,

34

750 F.2d 903, 911 (Fed. Cir. 1984), for determining when an unauthorized sale creates confusion

as to whether the trademark holder authorized or sponsored the sale:

> Bandag and Stormer indicate where the line should be drawn.  In
> Bandag, the Federal Circuit concluded that the defendant was not
> required to obtain authorization to sell plaintiff's trademarked
> goods, but that "it was obliged not to do so in a manner which
> would have been likely to suggest to prospective customers that it
> was part of [plaintiff's] organization of franchisees."  750 F.2d at
> 911.  Stormer similarly concluded that "defendants have used
> plaintiff's trademarks in a manner which is likely to cause the
> public to believe that defendants are part of [plaintiff's] authorized
> sales network," 587 F. Supp. 2d 279, and therefore required the use
> of an appropriate disclaimer, id. at 280.

H.L. Hayden, 879 F.2d at 1023-24.  Accord Matrix Essentials, 988 F.2d at 593 ("We are not

persuaded by [plaintiff]'s arguments as to expand the reach of section 1125(a) to provide a cause

of action merely for the unauthorized stocking and sale of a manufacturer's products.  Absent

more culpable conduct on the part of the seller, we are unwilling to find misrepresentation in the

mere act of putting a manufacturer's product on one's shelf and offering it for sale."); 4 J.

Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §25:43 (4th ed.) ("[T]he

distributor who is not an authorized dealer can use the trademark of the goods, but not in a way

that would suggest that the distributor is a part of the authorized dealer network.").

    In keeping with this approach, the Second Circuit and other courts have rejected

trademark infringement claims where the defendant made an unauthorized sale of a trademarked

good but there was no evidence of customer confusion.  See Polymer, 37 F.3d at 80-81

(preliminary injunction properly denied where defendant made unauthorized sale of trademarked

goods because no evidence of customer confusion); H.L. Hayden, 879 F.2d at 1022-24

(defendant entitled to summary judgment where defendant made unauthorized sales of

trademarked x-ray equipment without assembling, installing, and servicing the equipment as required by trademark holder because customers—far from confused—were well aware that defendant was not assembling, installing, or servicing the equipment); Matrix Essentials, 988 F.2d at 593 (defendant entitled to judgment as a matter of law where it did nothing more than make unauthorized sales of trademarked good).

Similarly, in those Second Circuit cases cited by Plaintiffs in which courts permitted a trademark claim for the unauthorized sale of a trademarked good, the courts specifically found consumer confusion. See El Greco Leather Prods. Co. v. Shoe World, Inc., 806 F.2d 392, 396 (2d Cir. 1986) (trademark holder established that retailer's conduct was "likely to cause confusion" where retailer made unauthorized sales of trademark holder's shoes and failed to comply with trademark holder's quality control procedures) (quoting 15 U.S.C. § 1114(1)(a)); Church of Scientology Int'l v. Elmira Mission of the Church of Scientology, 794 F.2d 38, 40 (2d Cir. 1986) (reversing denial of preliminary injunction and holding that "[c]ommon sense plainly suggests that when a terminated franchisee's continued use of its former franchisor's trademarks results in demonstrated consumer confusion, the franchisor has been irreparably harmed."); Warner Bros., Inc. v. Gay Toys, Inc., 658 F.2d 76, 79 (2d Cir. 1981) ("We have no doubt that Warner Bros. has met its burden of proof of the likelihood of confusion as to the sponsorship of the" infringing good).

Relying on the first sale doctrine, district courts in this Circuit have read these Second Circuit decisions requiring a showing of consumer confusion to be limited to those cases where the unauthorized sale followed an authorized sale. See, e.g. Ryan v. Volpone Stamp Co., 107 F. Supp. 2d 369, 381-82 (S.D.N.Y. 2000); Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc., 979

F. Supp. 224, 230-31 (S.D.N.Y. 1997); see also 4 McCarthy on Trademarks § 25:41 ("The [trademark] rule is sometimes called the 'first sale' doctrine because of its similarity in principle to the 'first sale' doctrine of copyright law.  The first sale doctrine of copyright law is an exception to the exclusive right of a copyright owner to distribute copies or phonorecords of the copyrighted work.  Under the copyright first sale doctrine, after the first sale of a lawfully made copy of the copyrighted work, anyone who is the owner of that copy can sell or dispose of that copy in any way without copyright liability").  In Liz Claiborne, Judge Sweet explained:

> It is well settled that sale of genuine goods without authorization by the trademark holder generally will not constitute trademark infringement.  See Polymer Tech. Corp. v. Mimran, 975 F.2d 58, 61 (2d Cir. 1992) ("As a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner.").  Such cases, however, usually arise when the initial sale of the trademarked goods was authorized and the second or subsequent sale is contested.  At that juncture, the first sale is exhausted.  See Osawa & Co. v. B & H Photo, 589 F. Supp. 1163, 1173 (S.D.N.Y. 1984) (under the exhaustion doctrine, a "markholder may no longer control branded goods after releasing them into the stream of commerce. . . . Down the line retailers are free to display and advertise the branded goods.  Secondhand dealers may advertise the branded merchandise for resale in competition with the sales of the markholder" (emphasis added)).  The question of whether a good is genuine, however, presupposes the initial sale was authorized.  As commented on in the Restatement:  "Trademarked goods produced by a manufacturer under contract with the trademark owner are not genuine goods until their sale under the mark is authorized by the trademark owner.  Thus, if the trademark owner rejects the goods, the manufacturer may not use the mark in reselling the goods to others."  Restatement (Third) of Unfair Competition § 24 comment c (1995).

Liz Claiborne, 979 F. Supp. at 230.  In Ryan, Judge Haight reached the same conclusion and explained how claims such as the instant one should be approached:

> [A] court faced with an infringement claim for unauthorized sales

of a trademarked product must perform a two-part test analysis. First, the court must consider whether the trademark owner authorized the first sale of the goods. Second, the court must consider whether the goods were genuine. If the initial sale was authorized, the court must undertake the second part of the analysis and determine whether, as a matter of fact, the goods which were later resold without authorization were genuine. If the goods were genuine, there is no violation of the Lanham Act despite the fact that the goods were resold without the trademark owner's consent[, unless the plaintiff can establish consumer confusion as to sponsorship, as described in the Second Circuit's decision in H.L. Hayden, 879 F.2d at 1023-24]. If the goods were not genuine, that is altered or not in keeping with the trademark owner's quality standards, a valid claim for trademark infringement is established. If the trademark owner did not approve the original sale, the goods cannot be considered genuine as a matter of law and infringement is established.

Ryan, 107 F. Supp. 2d at 382.

Neither party has cited any United States Supreme Court or Second Circuit decision addressing the first sale doctrine in the context of trademark law and, after independent research, this Court has not identified any such decision. Although both parties cited Ryan, neither party briefed the issue of whether Savino's sale of the goods to Italverde's customers constituted the "first sale" of the goods. Whether Savino seized the goods after the first sale occurred depends on whether the first sale doctrine requires: (1) merely a contract for sale of the trademarked goods; or (2) title to the goods to have actually changed hands pursuant to a *bona fide* sale; and (3) if change of title is required, whether title had changed hands at the time the goods were seized. It also depends on whether Savino's seizure of the goods constitutes a "sale" pursuant to the first sale doctrine. In any event, because (1) the parties have not briefed the first sale doctrine issue, (2) the Court has not identified any binding precedent holding that the first sale doctrine applies to a claim such as the instant one, (3) discovery is complete and the case is

ready for trial, and (4) denying Savino's motion for summary judgment will in no way complicate the factual issues to be presented at trial, this court will not, at this time, reach the issue of whether to read Polymer and H.L. Hayden to be limited to those cases where a first sale has already occurred. Instead, both parties' summary judgment motions as to the trademark claim are denied without prejudice to the parties raising the arguments presented in the motions at the time of trial.

### G. Savino's Right to Seize, Retain, and Sell the Pasta

In addition to moving for summary judgment on the first, third, fifth, and sixth claims, Plaintiffs seek "an Order finding that defendant [Savino] had no legal authority to retain plaintiffs' merchandise and sell it to plaintiffs' customers or resell it to plaintiff Italverde." (Pl. Br. at 1.) In support of this request, Plaintiffs argue that, even assuming *arguendo* that the March 10 Florence Civil Court Order was valid, Savino's seizure, retention, and sale of the pasta was somehow "wrongful" or "invalid" because Savino failed to follow New York's procedures for obtaining recognition and enforcement of an order or judgment of a foreign court. Plaintiffs assert that Savino's conduct constitutes illegal self-help. In response, Savino argues that: (1) "because Savino did not seek the assistance of New York courts to enforce the Florence Court Orders, there was no need for it to have those orders recognized by a New York [c]ourt"; (2) Savino was not required to have a New York court recognize the Florence Order because Savino seized "almost all" of the containers of pasta before the containers entered the United States; (3) outstanding factual issues prevent this court from determining whether judicial recognition by a New York court was required; and (4) Savino did not need to have a New York court recognize the Florence Order because it held a general lien over the pasta containers. (Def. Opp. Br. at 16.)

As a preliminary matter, it is not entirely clear which Florence Court Order(s) the parties are addressing. Plaintiffs make reference to only the March 10, 2004 Order in which the Civil Court of Florence issued an *ex parte* order directing Delverde to pay Savino Italy 604,818.06 euros plus costs and interest. (Pl. Br. at 7.) Plaintiffs do not make reference to the subsequent May 13, 2004 Florence Court Order permitting a judicial officer to seize the goods or the June 3, 2004 Judicial Officer of the Florence Court of Appeal's official seizure of the goods. In contrast, Savino's briefing makes reference to "orders." (Def. Opp. Br. at 16.) As Plaintiffs are the parties requesting the relief on this issue, at this time, the court will limit its consideration to the implications of the March 10, 2004 Florence Court Order.

The threshold legal issue raised by these arguments is whether Savino, having seized and sold the pasta without any United States judgment or other United States judicial authority for doing so, may now assert the March 10 Florence Court Order directing Delverde to pay Savino Italy 604,818.06 euros plus costs and interest as a defense to the instant claims. New York has adopted the Uniform Foreign Country Money Judgments Recognition Act ("UFCMJRA" or the "Act"). See N.Y. C.P.L.R. §5301, *et seq*. Under the Act, the judgment of a foreign country "which is final, conclusive and enforceable where rendered even though an appeal therefrom is pending or it is subject to appeal" is generally enforceable. N.Y. C.P.L.R. § 5302. Civil Practice Law and Rules Section 5304 specifically enumerates those circumstances in which a foreign judgment shall not be enforced and circumstances in which a court has discretion as to whether to enforce the foreign judgment.

Further, the Act explicitly addresses the procedural mechanisms through which a foreign judgment may be enforced:

> Except as provided in section 5304, a foreign country judgment [which is final, conclusive and enforceable] is conclusive between the parties to the extent that it grants or denies recovery of a sum of money. Such a foreign judgment is enforceable by an action on the judgment, a motion for summary judgment in lieu of complaint, or in a pending action by counterclaim, cross-claim *or affirmative defense*.

N.Y. C.P.L.R. § 5303 (emphasis added). The text of the Act unambiguously provides that a foreign money judgment may be raised using a variety of procedural vehicles, including but not limited to being raised as an affirmative defense. Although it appears that no court has ever considered the issue, this text makes clear that the existence of a foreign judgment can serve as a defense to a civil claim even though no New York state or federal court had recognized the judgment prior to the time that the civil claim was brought. In other words, a foreign judgment may serve as a defense to a tort claim even though the foreign judgment had not been recognized by an American court at the time the conduct that was the basis for a tort claim was committed.

Plaintiffs cite a number of cases that are inapposite. In Fuentes v. Sea-Land Services Inc., 665 F. Supp. 206, 210 (S.D.N.Y. 1987), the court did hold that a Guatemalan court order had to be recognized by a foreign court in order to be enforced. As a preliminary matter, Fuentes involved a court order that was not a money judgment and, as a result, did not involve the UFCMJRA. Even if Fuentes could be read as analogous to an action invoking the UFCMJRA, the Fuentes court found (1) the Guatemalan court that issued the order did not have jurisdiction over the property that was the subject of the order and (2) no party had sought to have the Guatemalan court order enforced in a United States court with jurisdiction. Nothing in Fuentes suggests that, contrary to the unambiguous language of the UFCMJRA, a party cannot seek recognition of a foreign country judgment by asserting the judgment as a defense in a civil

action. Similarly, in Allstate Insurance Company v. Administratia Asigurarilor De Stat, 962 F. Supp. 420, 424-25 (S.D.N.Y. 1997), the court specifically found that the UFCMJRA did not govern the enforceability of a Bucharest judgment because it nullified a contract as opposed to awarding or denying a sum of money. And, nothing in Dresdner Bank AG v. Haque, 161 F. Supp. 2d 259 (S.D.N.Y. 2001), where the plaintiff brought an action for the enforcement of a German judgment, suggests that a party cannot obtain recognition of a foreign money judgment by asserting it as a defense in a pending civil case.

Plaintiffs are correct that in Biel v. Boehm, 406 N.Y.S.2d 231, 949 (Sup. Ct. N.Y. Cy. 1978), the court stated that "recognition is only the first step in the process of enforceability of the judgment against properties of the defendant located in this state." Setting aside the fact that an appellate court has rejected aspects of the Biel court's reading of the procedures for enforcing foreign judgments, see Lenchyshyn v. Pelko Electric, Inc., 281 A.D.2d 42, 47-48 (4th Dep't 2001), the Biel language is nothing more than a recognition of the fact that, when seeking judicial enforcement of a foreign judgment, judicial recognition is followed by the actual enforcement by a sheriff or other appropriate enforcing authority. Similarly, the court in Bianchi v. Savino del Bene International Freight Forwarders, Inc., 329 Ill. App. 3d 908, 919, 770 N.E.2d 684, 693 (1st Dist. 2002), held "that before a party can enforce a judgment from a foreign country, the party must first have the foreign judgment recognized by the state in which he or she will be seeking enforcement"; however, that too is in the context of seeking judicial enforcement of a foreign court order. In short, as Savino correctly argues, the cases upon which Plaintiffs rely that do address the UFCMJRA involve a party asking a court to enforce a foreign

judgment.[8]  In such cases, recognition must precede judicial enforcement.  However, none of the

cases cited by Plaintiffs address the question raised here—whether a foreign judgment that had

not been recognized prior to a civil action can serve as a defense to a civil claim raised in the

answer.  The text of the statute is clear and unambiguously answers this question in the

affirmative.

Nor does this reading of the UFCMJRA raise any fairness concerns in the instant case.

First, this reading of the statute is consistent with New York's strong public policy favoring

recognition of foreign judgments.  See N.Y. C.P.L.R. § 5301, David A. Siegel Practice

Commentary ("So liberal has New York caselaw been in the recognition of the judgments of

foreign nations, in fact, that the occasion for the use of Article 53 has been rare.").

Second, this reading of the UFCMJRA does not create perverse incentives.  It permits a

party to engage in conduct that would be tortious but for the existence of the foreign judgment

without having first sought and obtained the recognition of the foreign judgment by a New York

state or federal court.  Nonetheless, in any case where there is a basis for believing that the

foreign judgment may not be enforceable, the party relying upon the foreign judgment has a

strong incentive to seek recognition of the foreign judgment before engaging in the potentially

tortious conduct.  The instant case provides an excellent example:  Savino engaged in conduct

that potentially could have had significant effects on Plaintiffs' business relationships and profits

for years to come.  To the extent that Savino would rely upon the foreign judgment as a defense

---

[8] In Marks v. United States, 15 Cl. Ct. 609, 612 (Cl. Ct. 1988), the court held that a foreign judgment that has not been recognized by a United States court does not confer a property interest protected by the Fifth Amendment.  Without reaching the question of whether to follow Marks, whether a foreign judgment gives rise to an interest protected by the Takings Clause of the Fifth Amendment is a separate question from whether a foreign judgment can be raised as a defense to a civil action.

to the claims stemming from the conduct, if Savino had any doubts about the validity of the foreign judgment, it would have been well-advised to seek and obtain recognition of the foreign judgment before engaging in the conduct.

Finally, nothing about this reading of the UFCMJRA prevents a party against whom a foreign judgment has been entered from bringing a declaratory judgment claim to establish that the foreign judgment is not entitled to recognition under the UFCMJRA. In those cases where a party against whom a foreign judgment is entered is likely to suffer large and/or catastrophic losses as a result of another party's self-enforcement of the foreign judgment, the party facing the losses can initiate a declaratory judgment action and seek injunctive relief.

In short, I find that the unambiguous language of the UFCMJRA that permits a party to raise a foreign money judgment as an affirmative defense requires this court to find that Savino may assert the Florence Court's March 10 Order as a defense to the instant claims. At this time, Savino has not asked the court to find that the Florence Court Order is enforceable under the UFCMJRA. However, in the event that the court ultimately determines that the Florence Court Order is enforceable, it will have the same effect as if it were a judgment of a New York state or federal court that had been issued on March 10, 2004. See N.Y. C.P.L.R. § 5302 David D. Siegel Practice Commentaries ("Once converted into a New York judgment . . . the foreign judgment becomes enforcible like a New York judgment.").

Because this court is only holding that the March 10 Order—if valid—is as enforceable as a New York judgment would be, nothing in this opinion in any way suggests that a foreign judgment entered in favor of a party permits a party to engage in illegal self-help. In certain circumstances, a New York judgment entered in favor of a party may authorize the party to

affirmatively seize property in the possession of the subject of the judgment in order to satisfy the judgment. Cf. Barrett v. Harwood, 189 F.3d 297, 300 (2d Cir. 1999) ("On default of payment, under the New York Uniform Commercial Code, a secured party has the right to take possession of its collateral. 'In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action.'") (quoting N.Y. U.C.C. Law § 9-503); Jefferds v. Ellis, 132 A.D.2d 321, 323-24 (4th Dep't 1987) (in certain circumstances, pre-judgment self-help is permitted at common law and under the UCC); N.Y. Prac., Enforcing Judgments and Collecting Debts § 3:301 (2006) ("Self-help repossession is allowed in some circumstances"). Similarly, this opinion finds only that the Florence Court Order—if valid—would have permitted Savino to seize property that it could have seized had the Florence Court Order been a New York judgment.

The parties have not briefed, and at this time the court will not consider any additional issues related to any defense based on the March 10 Order or other proceedings in the Italian courts. Such a defense may present a number of issues. First, with a few exceptions, the parties have not addressed whether, as a matter of substantive law, a money judgment against Delverde in favor of Savino Italy is a meritorious defense against any of the claims that Plaintiffs have stated. In other words, this Court does not decide whether Savino—who perhaps had physical possession of the pasta containers as a bailee or perhaps in some other capacity—could (a) seize the pasta, (b) communicate with Plaintiffs' customers in the manner that they did, and (c) ultimately sell the pasta to Plaintiffs' customers according to the terms that the sales were made without having committed any of the torts alleged in this case merely because—assuming *arguendo* that the court ultimately finds the Florence Court Order is entitled to recognition under

the UFCMJRA—of the monetary judgment in favor of Savino. Second, the parties have not addressed what effect, if any, the Florence court order permitting Savino Italy to seize the pasta containers has on this case.

## III. CONCLUSION

For the reasons described above, Plaintiffs' motion for summary judgment is DENIED and Savino's motion for summary judgment is also DENIED. The parties shall contact Magistrate Judge Viktor V. Pohorelsky for the purpose of setting a schedule for submitting a Proposed Pre-trial Order. At that time, counsel shall notify Judge Pohorelsky as to whether settlement discussions or mediation would be productive.

SO ORDERED.

Dated: April 10, 2007                                      /s/ Nicholas G. Garaufis
Brooklyn, N.Y.                                      NICHOLAS G. GARAUFIS
                                      United States District Judge